F.L., individually and on behalf of R.C.L., Plaintiffs,

v.

**BOARD OF EDUCATION OF the GREAT NECK U.F.S.D., Defendant.**

15–cv–5916 (SJF)(GRB)

United States District Court, E.D. New York.

Signed 08/15/2017

Gary S. Mayerson, Maria C. McGinley, Mayerson & Associates, New York, NY, for Plaintiffs.

Laura A. Ferrugiari, Frazer & Feldman, Garden City, NY, for Defendant.

## OPINION AND ORDER

FEUERSTEIN, District Judge:

Plaintiffs F.L., individually and on behalf of R.C.L. (together, "Plaintiffs"), com-

menced this action against Defendant Board of Education of the Great Neck U.F.S.D. ("Defendant" or the "District") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking, *inter alia*: (i) reversal of a June 17, 2015 Decision of New York State Review Officer Justyn Bates; and (ii) reimplementation of a March 23, 2015 Findings of Fact and Decision by Impartial Hearing Officer James McKeever, Esq. *See* Docket Entry ("DE") [1]. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. DE [30], [31]. For the reasons set forth herein, Plaintiffs' motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## I. BACKGROUND

### A. Relevant Facts[1]

#### 1. The Parties and R.C.L.'s Individual Needs

Plaintiff R.C.L. was born on August 29, 1999, and, at all relevant times, was classified as having various learning disabilities including: (i) attention deficit hyperactivity disorder ("ADHD"); (ii) severe predominantly inattentive presentation; (iii) developmental coordination disorder; (iv) severe specific learning disorder with impairment in reading; (v) severe specific learning disorder with impairment in written expression; and (vi) moderate to severe specific learning disorder with impairment in mathematics. Pls.' 56.1 Stmt. ¶¶ 1–2, 5–6. In addition to his learning disabilities, R.C.L. also suffers from: (i) auditory processing disorder, which affects his ability to integrate auditory information, and to recognize, discriminate, and process auditory messages; (ii) apraxia, which causes severe articulation difficulties; and (iii) severe oculomotor and visual processing delays in the areas of visual discrimination, visual memory, visual spatial relations, visual sequential memory, visual motor integration, visual processing speech, and laterality. *Id.* at ¶¶ 9–11. As a result of his learning disabilities and vision-related deficits, R.C.L. has significant difficulties with reading, mathematics, fine motor skills, pragmatic language, executive functioning, visual tracking, visual memory, auditory processing, attention, behavioral functioning, social functioning, and emotional functioning. *Id.* at ¶¶ 12–13. Plaintiff F.L. is R.C.L.'s father. *Id.* at ¶ 3. Defendant Board of Education of the Great Neck U.F.S.D. is a public authority and local education agency under the IDEA, and is therefore required to provide disabled children a free appropriate public education ("FAPE"). *Id.* at ¶ 4. At all relevant times, R.C.L. was a student in the District eligible to receive special education programing, services, and support as provided for under the IDEA. *Id.* at ¶ 19.

#### 2. R.C.L.'s Early Educational History[2]

##### *i. Preschool and Elementary School*

R.C.L. attended Variety Child Learning Center in Syosset, New York from preschool through first grade, and enrolled in the District as a second grade student at John F. Kennedy Elementary School in Great Neck, New York during the 2004–05 school year. *Id.* at ¶¶ 20–22. Upon enrollment at John F. Kennedy Elementary

---

1. Unless otherwise noted, the facts are drawn from Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Pls.' 56.1 Stmt."), DE [31], and Defendant's Rule 56.1 Statement ("Def.'s 56.1 Stmt."), DE [30].

2. Although the instant action concerns the 2012–13, 2013–14, and 2014–15 school years, a brief history of R.C.L.'s educational background is provided for context. Pls.' 56.1 Stmt. ¶ 5; Def.'s 56.1 Stmt. ¶ 7.

School, the District classified R.C.L. as having multiple learning disabilities, placed him in a self-contained 12:1:1 special education classroom,[3] and provided special education services for R.C.L. *Id.* at ¶¶ 22–23. As an elementary school student, R.C.L. had significant difficulties with academic progress, including difficulties in reading, writing, and mathematics. *Id.* at ¶ 24.

In January 2007, R.C.L. underwent psychological testing which reflected "extremely low processing speeds" and revealed that R.C.L.'s working memory deficits may lead to difficulties in following directions, retaining information long enough to process it for understanding, recalling sentences and factual information, and comprehending lengthy discourse. *Id.* at ¶¶ 26–27, 29. R.C.L. also had difficulty drawing inferences, creating solutions to problems, transferring and generalizing information, and solving abstract problems. *Id.* at ¶ 28. A psychological evaluation conducted during R.C.L.'s third grade year reflected persisting deficits in processing speed and problem solving skills. *Id.* at ¶¶ 30–31. During R.C.L.'s fifth grade year, R.C.L.'s parents secured Lindamood Bell ("LMB") supports and services for R.C.L. in reading and mathematics. *Id.* at ¶ 36. At F.L.'s request, the District performed an assistive technology ("AT") evaluation at the end of R.C.L.'s fifth grade year. *Id.* at ¶ 37. Although the District recommended, *inter alia*, "Dragon speech-to-text" software, the District initially had trouble obtaining AT for R.C.L. and provided R.C.L. with a Kindle. *Id.* at ¶¶ 39–42. According to Plaintiffs, when the District ultimately attempted to implement speech-to-text software in 2013, "it was less than effective because R.C.L.'s teachers apparently did not follow the steps to enable and program the device to understand R.C.L.'s significant speech production impediments." *Id.* at ¶ 43.

### ii. Middle School

Beginning in his sixth grade year, R.C.L. attended middle school at North Middle School in Brentwood, New York, where he was again classified as having multiple learning disabilities and was placed in a 12:1:1 classroom. *Id.* at ¶¶ 46–48. As a sixth grade student, R.C.L. received instruction in self-contained classes for his core academic subjects, as well as speech therapy, occupational therapy, and "Wilson Reading every other day as a building-level support." *Id.* During the 2011–12 school year, the District conducted a comprehensive psycho-educational evaluation of R.C.L., which established that he "struggled with processing speed, fluid reasoning, visual memory, auditory working memory, visual-motor integration, learning problems, anxiety in the classroom, withdrawn behavior, impaired social skills, and delayed daily living skills." *Id.* at ¶¶ 49–50. Accordingly, R.C.L. was again placed in self-contained classes for all of his core academic subjects and received related services including speech therapy, occupational therapy, counseling, and building-level support of Wilson Reading every other day. *Id.* at ¶¶ 51–52. In April 2012, R.C.L. took the Grade 7 English Language Arts State and District-wide assessment and the Grade 7 Mathematics State and District-wide assessment, and received a score of one (1) on each examination, which is the lowest possible score. *Id.* at ¶¶ 55–56. Although F.L. requested that the District test R.C.L. for dyslexia, Plaintiffs claim that "the District dismissively ... told R.C.L.'s father that R.C.L.

---

**3.** A 12:1:1 classroom is a classroom with twelve (12) students, one (1) special education teacher, and one (1) teacher's aide.

[was] already getting all the services that he would get even if he was dyslexic." *Id.* at ¶¶ 53–54 (internal quotation omitted).

### 3. 2012–2013 School Year

On May 24, 2012, the District's Committee on Special Education (the "CSE") met for R.C.L.'s annual review and to develop an individualized education program ("IEP") for R.C.L. for the 2012–13 school year (the "May 2012 IEP"), which was projected to be implemented on September 4, 2012. *Id.* at ¶¶ 57, 60. The CSE classified R.C.L. as having a learning disability and recommended that he: (i) be placed in self-contained special education classes in a 12:1:1 classroom at Great Neck North High School ("Great Neck North") for his core academic subjects, including English, math, science, and social studies; (ii) attend forty (40) minutes of resource room on a daily basis in a 5:1 setting; (iii) attend thirty (30) minutes of speech and language therapy two-and-a-half (2.5) times per week in a 5:1 setting; (iv) attend one (1) individual occupational therapy session per week; (v) attend one (1) thirty (30) minute group counseling session per week in a 5:1 setting; and (vi) receive additional supports, modifications, and accommodations, including, *inter alia*, AT to help compensate for R.C.L.'s significant reading and writing difficulties. *Id.* at ¶ 58; *see also* Def.'s 56.1 Stmt. ¶ 19. Although not specifically identified in the May 2012 IEP as an educational program or related service, during the 2012–13 school year, R.C.L. also received "building-level support services," including: (i) individual reading instruction every other day from a Level 1 Wilson-certified special education reading teacher; and (ii) individual math services every other day in the math learning center. Pls.' 56.1 Stmt. ¶ 58; Def.'s 56.1 Stmt. ¶¶ 13, 21–22. The May 2012 IEP further stated that a Functional Behavior Analysis ("FBA") and Behavior Intervention Plan

("BIP") would be conducted in the fall of 2012. *Id.* Plaintiffs agreed with the outcome of the May 24, 2012 CSE meeting. Def.'s 56.1 Stmt. ¶ 23.

At F.L.'s request, the CSE met again on November 30, 2012 to monitor R.C.L.'s progress, to review R.C.L.'s FBA and BIP, and to review and revise the May 2012 IEP as necessary (the "November 2012 IEP"). Pls.' 56.1 Stmt. ¶ 61; Def.'s 56.1 Stmt. ¶¶ 24–25. At the November 30, 2012 meeting, the CSE reviewed: (i) R.C.L.'s May 2012 report card; (ii) a March 19, 2012 Annual Review Report; (iii) a March 7, 2012 Speech and Language Annual Review Report; (iv) a February 27, 2012 Occupational Therapy Annual Review Report; and (v) a February 17, 2012 Counseling Review Progress Summary. Def.'s 56.1 Stmt. ¶ 25. In the November 2012 IEP, the CSE noted that R.C.L. demonstrated progress in reading when he received accommodations and supports. *Id.* at ¶ 26. Although the CSE did not modify R.C.L.'s educational program in the November 2012 IEP, the CSE recommended that R.C.L. receive additional motivational strategies in the classroom. *Id.* at ¶ 27. F.L. was present at the November 30, 2012 CSE meeting, and, although he "voiced a number of concerns throughout the meeting," he did not ultimately object to the educational program provided for in the November 2012 IEP. *Id.* at ¶ 28; Pls.' 56.1 Stmt. ¶ 28.

In his report card for the 2012–13 school year, R.C.L.'s math teacher, Ms. Booth, wrote that assignments and assessments "were modified," and that "R.C.L. put in a lot of effort and came to extra help." Pls.' 56.1 Stmt. ¶ 64. Ms. Booth further wrote that R.C.L. "struggled with many of the topics [that] quarter." *Id.* Similarly, R.C.L's social studies teacher, Ms. Parker, noted that R.C.L.'s "progress [was] satisfactory," but that he needed "to attend

extra help." *Id.* at ¶ 65; Def.'s 56.1 Stmt. ¶ 65. Although R.C.L. "fell below grade level in English Language Arts and Mathematics" during the 2012–13 school year, he received passing grades in all of his core classes, including grades of eighty-three (83) in English, sixty-nine (69) in math, eighty-eight (88) in science, and eighty-seven (87) in social studies. Pls.' 56.1 Stmt. ¶ 66; Def.'s 56.1 Stmt. ¶¶ 34, 66.

#### 4. 2013–2014 School Year

On June 17, 2013, the CSE met to review R.C.L.'s annual progress and to develop an IEP for the 2013–14 school year (the "June 2013 IEP"). Pls.' 56.1 Stmt. ¶ 67. At the June 17, 2013 meeting, the CSE reviewed: (i) R.C.L.'s June 16, 2013 report card; (ii) a February 9, 2013 Annual Review Report; (iii) a February 8, 2013 Occupational Therapy Annual Review Report; (iv) a February 8, 2013 Speech and Language Annual Review Report; and (v) a January 14, 2013 Counseling Progress Summary. Def.'s 56.1 Stmt. ¶ 32. The CSE determined that, during the 2012–13 school year, R.C.L. had achieved seventeen (17) of the twenty-eight (28) goals identified in the November 2012 IEP, and that he was gradually or satisfactorily progressing on nine (9) of the remaining goals. *Id.* at ¶ 33. Plaintiffs dispute R.C.L.'s progress, and claim that, if he "had, in fact, mastered 17 of the 28 annual goals for the 2012–13 school year, the district would not have continued or otherwise reworded many of those goals and objectives into the 2013–2014 IEP for R.C.L." Pls.' 56.1 Stmt. ¶ 33. The June 2013 IEP notes that the CSE "discussed less restrictive and more restrictive" classroom options, and ultimately recommended that R.C.L. be placed in special education "Foundations" classes in a 15:1 classroom at Great Neck North for his four (4) core academic courses.[4] Def.'s 56.1 Stmt. ¶ 37; *see also* Pls.' 56.1 Stmt. ¶¶ 68–70. The Foundations program offers a small, intensive and supportive language-based program on a Regents track over a two (2)–year span, which allows teachers to work at each student's individual pace and differentiate instruction to meet each student's individual needs. Def.'s 56.1 Stmt. ¶ 38. The CSE further recommended that R.C.L.: (i) attend forty (40) minutes of resource room in a 5:1 setting on a daily basis as well as "reading instruction . . . in a special class setting"; (ii) attend thirty (30) minutes of speech and language therapy on alternating days during the week; (iii) attend thirty (30) minutes of individual occupational therapy one (1) time per week; and (iv) attend thirty (30) minutes of group counseling in a 5:1 setting two (2) times per month. *Id.* at ¶¶ 35, 42; Pls.' 56.1 Stmt. ¶ 68. It is undisputed that Plaintiffs did not object to R.C.L.'s June 2013 IEP. Def.'s 56.1 Stmt. ¶ 43.

On November 12, 2013, at F.L.'s request, the CSE met to review R.C.L.'s progress and educational programming since entering high school at Great Neck North and to review and revise the June 2013 IEP as necessary (the "November 2013 IEP").[5] *Id.* at ¶ 44; Pls.' 56.1 Stmt. ¶ 117. The CSE reviewed: (i) R.C.L.'s October 21, 2013 FBA and BIP; (ii) an October 21, 2013 Progress Report; and (iii) an August 10, 2013 Auditory Processing Evaluation conducted by Dr. Donna Geffner. Def.'s 56.1 Stmt. ¶ 45. Based upon its review of recent evaluations, as well as R.C.L.'s teachers' and related service providers' reports and assessments, the CSE concluded that R.C.L. was making prog-

---

4. A 15:1 classroom is a classroom with fifteen (15) students and one (1) special education teacher.

5. The November 12, 2013 CSE meeting took place over the course of two (2) days: October 21, 2013 and November 12, 2013.

ress under the placement and educational programming provided for in the June 2013 IEP. *Id.* at ¶ 46. The November 2013 IEP did not modify R.C.L.'s placement in the Foundations program, but also added an individual aide in the resource room during delivery of R.C.L.'s reading program and provided for forty (40) minutes of consultant teacher services on alternating days of the week. *Id.* at ¶ 47; Pls.' 56.1 Stmt. ¶¶ 118–19. Although Plaintiffs dispute the adequacy of R.C.L.'s reading program, it is undisputed that the November 2013 IEP both: (i) formally recommended an individualized reading program to address R.C.L.'s reading comprehension, vocabulary, phonics, phonemic awareness, and fluency; and (ii) added reading goals in phonics, phonological awareness, fluency, and homework. Def.'s 56.1 Stmt. ¶¶ 48–50. Thereafter, Ms. Danielle Verderose, a certified special education teacher, delivered R.C.L.'s reading program with the assistance of an individual aide. *Id.* at ¶ 51.

At the November 12, 2013 CSE meeting, F.L. also requested that the District conduct an AT evaluation and provide for a neuropsychological evaluation of R.C.L. Pls.' 56.1 Stmt. ¶ 121. Although the District agreed to conduct an AT evaluation, it stated that it would provide for a neuropsychological evaluation in the spring of 2014. *Id.* at ¶ 122. Accordingly, Plaintiffs sought a private neuropsychological evaluation from Dr. Jennifer Oratio, who both conducted psychological testing and observed R.C.L. in a classroom setting. *Id.* at ¶¶ 123–24. According to Plaintiffs, "[t]he results of Dr. Oratio's testing and evaluation establishes that R.C.L. had, in some areas, stagnated and languished." *Id.* at ¶ 128. Based upon psychological testing and observations, Dr. Oratio concluded, *inter alia,* that R.C.L.'s "academic and interpersonal skills have shown regression over time, [and that] it is vital that he receives 1:1 instruction in a small, therapeutic envi-

ronment where there is close coordination of care and where mental health professionals are also available." *Id.* at ¶ 133.

On April 2, 2014, at F.L.'s request, the CSE held a meeting to evaluate R.C.L.'s progress, review Dr. Oratio's evaluation report, and modify the November 2013 IEP as necessary (the "April 2014 IEP"). Def.'s 56.1 Stmt. ¶ 55; Pls.' 56.1 Stmt. ¶ 137. Dr. Oratio participated in the April 2, 2014 meeting, discussed her report, and contributed to the discussion of R.C.L.'s levels, needs, goals, and educational programming. Def.'s 56.1 Stmt. ¶ 57; Pls.' 56.1 Stmt. ¶ 138. Although R.C.L.'s independent reading level remained unchanged at the third grade level, his teachers and related service providers reported that R.C.L. was working hard, had made good progress on his IEP goals, and was utilizing the AT made available to him. Def.'s 56.1 Stmt. ¶ 56; Pls.' 56.1 Stmt. ¶ 142. The April 2014 IEP did not modify the educational programming or related services provided in the November 2013 IEP. Pls.' 56.1 Stmt. ¶ 141. On April 11, 2014, Plaintiffs received additional AT training on the use of the iPad, Co-writer, PaperPort notes, Voice Dream Reader, and Google Drive. *Id.* at ¶¶ 59–60. During the 2013–14 school year, in his core subjects, R.C.L. earned a seventy (70) in English, a seventy-six (76) in social studies, an eighty (80) in math, and a sixty-five (65) in science. Def.'s 56.1 Stmt. ¶ 65.

### 5. 2014–2015 School Year

On June 5, 2014 and June 24, 2014, the CSE met to review R.C.L.'s annual progress and to develop R.C.L.'s IEP for the 2014–15 school year (the "June 2014 IEP"). Pls.' 56.1 Stmt. ¶ 143; Def.'s 56.1 Stmt. ¶ 62. At the June 2014 meetings, the CSE reviewed: (i) R.C.L.'s June 2014 report card and attendance records; (ii) a May 28, 2014 Social History Update and

Speech and Language Re-evaluation; (iii) a May 27, 2014 Observation; (iv) a May 22, 2014 Annual Review Report and Occupational Therapy Re-evaluation; and (v) various vocational assessments and medical and psychological updates. Def.'s 56.1 Stmt. ¶ 63. During the 2013–14 school year, R.C.L. achieved seventeen (17) of the thirty-two (32) goals identified in the April 2014 IEP, and he was progressing satisfactorily on eight (8) of the remaining goals. Id. at ¶ 67. At the June 5, 2014 CSE meeting, the school's staff stated that R.C.L. had made significant academic gains and had improved his motivation and participation in class upon implementation of the BIP. Id. at ¶¶ 68, 74. Although Plaintiffs do not dispute that the CSE stated that R.C.L. had made "significant gains," they claim that "the objective testing established that he had not." Pls.' 56.1 Stmt. ¶ 68. Accordingly, at the June 4, 2014 CSE meeting, R.C.L.'s parents informed the CSE of their intent to file a due process complaint. Def.'s 56.1 Stmt. ¶ 78. Although Plaintiffs disagreed with R.C.L.'s placement in the Foundations program, in the June 2014 IEP, the CSE recommended that R.C.L.: (i) continue to be placed in the Foundations program in a 15:1 classroom at Great Neck North for his four (4) core academic subjects; (ii) attend forty (40) minutes of resource room in a 5:1 setting on a daily basis; (iii) attend thirty (30) minutes of speech and language therapy on alternating days during the week; (iv) attend thirty (30) minutes of individual occupational therapy one (1) time per week; (v) attend thirty (30) minutes of individual counseling one (1) time per week; and (vi) attend forty (40) minutes of individual consultant services on alternating days during the week. Def.'s 56.1 Stmt. ¶ 83. At the June 24, 2014 CSE meeting, R.C.L.'s parents stated that they would not agree to an IEP for R.C.L. unless it mirrored the placement and sup-

ports requested in their due process complaint. Id. at ¶ 79; Pls.' 56.1 Stmt. ¶¶ 144–45. Plaintiffs further informed the District that R.C.L. would be enrolled in LMB services for the summer of 2014. Pls.' 56.1 Stmt. ¶ 95.

### B. Procedural Background
#### 1. Plaintiffs' Due Process Complaint

On June 24, 2014, Plaintiffs formally filed their due process complaint ("DPC"), claiming that the District failed to provide a FAPE for R.C.L. during the 2010–11, 2011–12, 2012–13, and 2013–14 school years, and that R.C.L.'s corresponding IEPs were both procedurally and substantively inadequate. Pls.' 56.1 Stmt. ¶¶ 159–60. Plaintiffs claimed that the IEPs were procedurally inadequate because, *inter alia*, the District deprived them of the opportunity to meaningfully participate in the CSE process. *See generally* Record Before State Review Officer ("Admin. R."), DE [19], at Ex H ("Pls.' DPC"). Plaintiffs claimed that the IEPs were substantively inadequate because, *inter alia*, Defendant failed to appropriately evaluate R.C.L. and design an educational program that met his individualized needs. *Id.* Accordingly, Plaintiffs sought: (i) reimbursement for the cost of LMB services that Plaintiffs funded during the summer of 2014; (ii) individual tutoring in each of R.C.L.'s core subjects; and (iii) an undisclosed compensatory amount of educational and extended school year ("ESY") services. Def.'s 56.1 Stmt. ¶ 87; Pls.' 56.1 Stmt. ¶ 161.

#### 2. IHO Hearing and Decision

Over the course of fourteen (14) nonconsecutive days between August 25, 2014 and January 13, 2015, Impartial Hearing Officer James McKeever, Esq. (the "IHO") held a hearing regarding Plaintiffs' DPC (the "IHO Hearing"). Def.'s 56.1 Stmt. ¶ 88. At the outset of the IHO Hearing, the IHO ruled that Plaintiffs' claims that

accrued prior to June 24, 2012 were barred by the IDEA's two (2)–year statute of limitations. *Id.* at ¶ 90. Plaintiffs clarified that the relief they sought included: (i) continued placement in the Foundations program classes for R.C.L.'s core academic subjects; (ii) one (1) period per day of tutoring with a certified special education teacher in each of R.C.L.'s four (4) core subject; (iii) compensation for LMB services; (iv) ESY services for R.C.L.; and (v) AT training for Plaintiffs. *Id.* at ¶ 92. At the IHO Hearing, fourteen (14) witnesses provided a total of two thousand, one hundred and seventy-one (2,171) pages of testimony, and the parties introduced seventy-five (75) exhibits into evidence. *Id.* at ¶ 89; *see also* Pls.' 56.1 Stmt. ¶¶ 16–17.

In a March 23, 2015 Findings of Fact and Decision (the "IHO Decision"), the IHO concluded that Defendant failed to provide a FAPE for R.C.L. during the 2012–13, 2013–14, and 2014–15 school years.[6] Def.'s 56.1 Stmt. ¶ 93; Pls.' 56.1 Stmt. ¶ 183. With respect to the 2012–13 school year, the IHO observed that, despite evidence of significant cognitive deficits, as well as R.C.L.'s "very poor results" on New York state assessments and other academic testing, "the CSE continued to recommend that same program that R.C.L. had the year before." IHO Dec., DE [19–3], at 31–32. As the CSE's educational program "did not include a targeted program to address R.C.L.'s deficits in reading and math," the IHO held that the District failed to provide a FAPE for the 2012–13 school year because the IEPs "failed to meet [R.C.L.'s] individual

needs." *Id.* at 32–33. The IHO held that the District failed to provide a FAPE for R.C.L. during the 2013–14 school year because, *inter alia*: (i) placement in a 15:1 classroom "was insufficient to meet R.C.L.'s educational needs"; (ii) reading services from the prior year had been eliminated and "there [were] no reading services and/or reading program listed on this IEP other than a note that reading would be worked on in Resource Room"; and (iii) the CSE failed to appropriately conduct a FAB and BIP to address R.C.L.'s difficulty with initiating tasks and working independently." *Id.* at 34–35. With respect to the 2014–15 school year, the IHO held that the District failed to provide a FAPE for R.C.L. because, *inter alia*: (i) beginning in April 2014, the CSE denied Plaintiffs the opportunity to meaningfully participate in the CSE process; and (ii) "objective testing results, which the District did not disagree with, showed that R.C.L. was severely delayed academically and that he was not making progress in the District's program." *Id.* at 35–37. The IHO further held that, based on R.C.L.'s minimal progress in reading, the CSE should have recommended ESY services for R.C.L. during the summers of 2012, 2013, and 2014, and that the failure to do so resulted in a denial of a FAPE for those school years. *Id.* at 33.

Based upon his determination that the District failed to provide a FAPE for R.C.L. during the 2012–13, 2013–14, and 2014–15 school years, the IHO ordered the District to: (i) provide funding for LMB courses, including seven hundred and fifty

---

6. Although Plaintiffs also sought relief pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, and 42 U.S.C. § 1983 ("Section 1983"), the IHO held that: (i) there was insufficient evidence to sustain Plaintiffs' claim arising under the Rehabilita-

tion Act; and (ii) he lacked jurisdiction over Plaintiffs' claims arising under the ADA and Section 1983. Pls.' 56.1 Stmt. ¶ 184. Plaintiffs did not appeal those portions of the IHO Decision, and the merits of Plaintiffs' claims arising under the ADA, Rehabilitation Act, and Section 1983 are not presently before this Court.

(750) hours of reading remediation and seven hundred and fifty (750) hours of math remediation; (ii) reimburse Plaintiffs four thousand, five hundred dollars ($4,500) for Dr. Oratio's independent neuropsychological examination; and (iii) reimburse Plaintiffs for expenses related to R.C.L.'s enrollment in LMB courses during the summer of 2014. *Id.* at 39–40. The IHO further held that R.C.L. was not entitled to an additional class per day in each of his core subjects, but ordered the District to reconvene and develop a new IEP recommending that R.C.L. be placed in a non-Regents curriculum in a class smaller than a 15:1 classroom. *Id.*

### 3. The District's Appeal and the SRO Decision

On April 16, 2015, the District appealed the IHO Decision to the New York State Education Department State Review Office.[7] Def.'s 56.1 Stmt. ¶ 94. The District argued, *inter alia,* that the IHO: (i) erred in finding that the District failed to provide a FAPE during the 2011–12, 2012–13, and 2013–14 school years; (ii) improperly relied upon R.C.L.'s May 2012 IEP as it was barred by the statute of limitations; (iii) improperly made *sua sponte* findings on claims not raised in Plaintiffs' DPC; (iv) erred in awarding reimbursement for ESY services; (v) misquoted and mischaracterized testimony and made improper credibility determinations; (vi) erred in finding that the CSE failed to develop a specific reading program for R.C.L.; (vii) erred in finding that Plaintiffs were denied a meaningful opportunity to participate in the CSE meetings and IEP development process beginning in April 2014; (viii) erred in finding that equitable considerations favored Plaintiffs; and (ix) erred in awarding relief not supported by the record. *Id.*

In a June 17, 2015 Decision (the "SRO Decision"), State Review Officer Justyn P. Bates (the "SRO"), reversed the IHO Decision and held that the District provided a FAPE for R.C.L. during the 2011–12, 2012–13, and 2013–14 school years. Def.'s 56.1 Stmt. ¶¶ 95–97; *see also* Affirmation of Laura A. Ferrugiari in Support of Defendant's Cross–Motion for Summary Judgment ("Ferrugiari Aff."), DE [30], at Ex. A. As a preliminary matter, the SRO held that claims for ESY services during the summer of 2012 were barred by the IDEA's two (2)–year statute of limitations, as any such claims would have arisen out of the May 2012 IEP. SRO Dec. at 12–13. The SRO observed that, because Plaintiffs attended the May 24, 2012 CSE meeting, they "had until May 24, 2014 to file a due process complaint notice with respect to the May 2012 IEP." *Id.* Because the "actionable aspects" of the 2012–13 school year occurred outside of the IDEA's statute of limitations—namely, the failure to provide ESY services during the summer of 2012—the SRO held that the IHO improperly relied on the May 2012 IEP. *Id.*

In assessing the adequacy of R.C.L.'s educational programming, the SRO considered, *inter alia,* R.C.L.'s yearly progress, R.C.L.'s known needs during the school years at issue, and whether the CSE's recommendations were adequate in light of R.C.L.'s needs and progress. With respect to the 2012–13 school year, the SRO held that: (i) R.C.L.'s placement in a 12:1:1 classroom was likely to promote progress and not regression; and (ii) the May 2012 and November 2012 IEPs (together, the "2012–13 IEPs") provided for substantively adequate reading and math programs. *Id.* at 18–22. With respect to the 2013–14 school year, the SRO held that: (i) place-

---

**7.** Plaintiffs did not appeal any portion of the IHO Decision, including those portions of the IHO Decision in which the IHO ruled against Plaintiffs. *See* SRO Dec. at 9 n.9.

ment in the Foundations program in a 15:1 classroom was likely to promote progress and not regression; and (ii) the June 2013, November 2013, and April 2014 IEPs (collectively, the "2013–14 IEPs") R.C.L.'s IEPs provided substantively adequate reading and math programs. *Id.* at 30–35. With respect to the 2014–15 school year, the SRO held that: (i) the District afforded Plaintiffs the opportunity to meaningfully participate in the CSE process; and (ii) R.C.L.'s continued placement in the Foundations program in a 15:1 classroom was appropriate. *Id.* at 43–44. The SRO further observed that, although the IHO cited the correct legal standard with respect to the provision of ESY services, "the IHO did not cite to any evidence in the hearing record indicating that the June 2013 CSE had before it evidence of substantial regression." *Id.* at 35. Therefore, the SRO held that Plaintiffs were not entitled to ESY services for the summers of 2013 and 2014. *Id.* at 35, 44.

Based upon the foregoing, the SRO concluded that the "hearing record supports a finding that the district offered [R.C.L.] a FAPE for the 2012–13, 2013–14, and 2014–15 school years but that the district must reimburse the parents for the cost of the private neuropsychological evaluation." *Id.* at 48. The SRO reversed and annulled those portions of the IHO Decision ordering the District: (i) to reconvene and develop an IEP that provided for smaller classes in a non-Regents program; (ii) to pay the costs of R.C.L.'s enrollment in LMB courses during the summer of 2014; and (iii) provide reimbursement for the costs of compensatory services, including seven hundred and fifty (750) hours of LMB reading remediation and seven hundred and fifty (750) hours of LMB math remediation. Pls.' 56.1 Stmt. ¶ 97.

### 4. The Instant Action

On October 14, 2015, Plaintiffs commenced this action against the District pursuant to the IDEA, seeking: (i) reversal of the SRO Decision, and (ii) reinstatement of the IHO Decision. DE [1]. According to Plaintiffs, the SRO Decision was "erroneous, less than thorough, and contrary to federal and State law and regulation as an arbitrary result that is contrary to the evidentiary record, statutory mandates, the Prong I burden of proof that was on defendant, the Second Circuit's rule against reliance upon 'retrospective evidence,' and the other review standards set forth by the Second Circuit." Compl., DE [1], ¶ 74. On November 24, 2015, Defendant filed its Verified Answer in which it seeks judgment against Plaintiffs dismissing the Complaint and upholding the SRO Decision in its entirety. DE [11].

On May 6, 2016, the parties submitted the instant cross-motions for summary judgment. DE [30], [31]. In moving for summary judgment, Plaintiffs argue, *inter alia*, that, "[b]ased upon the controlling statutes, an independent review of the evidentiary record, and the application of the Second Circuit's controlling review standards, this Court should reverse the SRO's June 17, 2015 Decision and reinstate the IHO's well-reasoned, thorough and amply supported March 23, 2015 Decision." *See* Plaintiffs' Motion for Modified De Novo Review ("Pls.' Mem."), DE [31], at 2. According to Plaintiffs, "defendant's IEP failed to meet [the applicable] standard of care because, *inter alia*, year after year, in the face of R.C.L.'s demonstrable regression and stagnation, defendant's IEPs largely regurgitated many of the same IEP goals for R.C.L." *Id.* at 4. Plaintiffs further argue that "the SRO decision was not 'reasoned and supported by the record' and therefore, merits little, if any, deference." *Id.* at 11. In its cross-motion for summary judgment, the District argues that "the Court should defer to the SRO's

well-reasoned and thorough decision, rendered after an exhaustive and independent review of the underlying record and weighing of the relevant evidence ...." *See* Defendant's Memorandum of Law ("Def.'s Mem."), DE [30], at 1. According to Defendants, the SRO Decision should be affirmed because, *inter alia*, "the SRO decision correctly analyzed Plaintiffs' challenges in the context of the IEP's mandates and is entitled to deference." *Id.* at 3.

## II. LEGAL STANDARD

### A. IDEA Legal Framework

 ▪Congress enacted the IDEA "to provide disabled students with a 'free appropriate public education' in the least restrictive environment suitable for their needs." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (quoting *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 150 (2d Cir. 1992)). A disabled student's FAPE must include special education and related services tailored to meet the unique needs of a particular child, and must be reasonably calculated to enable the child to receive educational benefits. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006). Therefore, a FAPE under the IDEA will necessarily be different for each child, as the IDEA expressly rejects any "one size fits all" approach or restrictions that preclude the genuine individualization of a student's educational program. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004). The IDEA "effectuates [its] purpose via an IEP, developed in collaboration among the student's parents, teachers, and school district representatives." *Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.*, 820 F.Supp.2d 490, 501 (S.D.N.Y. 2011); *see also Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1988) (describing a student's

IEP as Congress's intended "centerpiece of the statute's education delivery system for disabled children"). A disabled student's IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *F.B. v. New York City Dep't of Educ.*, 132 F.Supp.3d 522, 534 (S.D.N.Y. 2015) (quoting *Honig*, 484 U.S. at 311, 108 S.Ct. at 598); *see also R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (holding that a disabled student's IEP must be "reasonably calculated to enable the child to receive educational benefits"). Pursuant to the IDEA, a student's IEP must provide an " 'appropriate education, not one that provides everything that might be thought desirable by loving parents.' " *R.B. ex rel. D.B. v. New York City Dep't of Educ.*, 603 Fed.Appx. 36, 38 (2d Cir. 2015) (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998)). Pursuant to New York law, a school district's Committee on Special Education bears the responsibility of developing a disabled student's IEP. *See* N.Y. Educ. Law § 4402(1)(b)(1). New York law further provides that a CSE must consist of, *inter alia*: "the Parents of the student in question; the student's regular or special education teacher; a school psychologist; a district representative 'qualified to provide or administer or supervise special education and ... knowledgeable about the general curriculum and the availability of resources of the school district'; and an additional parent representative ...." *F.B.*, 132 F.Supp.3d at 534 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).

 When disputes regarding a student's IEP arise between the student's parents and the school district, the IDEA

provides for due process procedures to resolve any such disputes. 20 U.S.C. §§ 1415(b)(6)–(b)(7). Specifically, the IDEA guarantees parents of disabled students "both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12, 108 S.Ct. at 598; *see also Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) ("Congress also included within the IDEA procedural safeguards that enable parents and students to challenge the local educational agency's decisions."). Pursuant to the IDEA, the parent of a disabled child may request a due process hearing in order to present complaints regarding "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education . . . ." 20 U.S.C. § 1415(b)(6)(A); *see also* 20 U.S.C. §§ 1415(f), (g) (describing the IDEA's impartial hearing and appeal process); *B.M. v. New York City Dep't of Educ.*, 569 Fed.Appx. 57, 58 (2d Cir. 2014) ("If a parent believes that her child's IEP or the school's implementation of the IEP does not comply with the IDEA, the parent may file a 'due process complaint' with the appropriate state agency."); *M.M. ex rel. J.M. v. New York City Dep't of Educ.*, No. 09 Civ. 5236, 2010 WL 2985477, at *2 (S.D.N.Y. July 27, 2010) ("Foremost among the procedural safeguards is the right to seek an administrative impartial due process hearing.") (internal quotations omitted). New York state's administrative review process provides for a two (2)–step system when a parent requests that a student's IEP be reviewed, including: "(1) a review of the matter by an impartial hearing officer; and (2) a possible appeal to a state review officer, who may modify any determination made by the impartial hearing officer." *Baldessarre*, 820 F.Supp.2d at 501 (internal citation omitted); *see also* N.Y. Educ. Law §§ 4404(1)–(2) (describing New York state's procedures for administrative review); *Cave*, 514 F.3d at 245 ("First, an impartial hearing officer is selected from a list of certified officers and appointed by the local board of education or the competent state agency to conduct the initial hearing and issue a written decision. That decision can then be appealed to a state review officer of the New York Education Department."). After a parent has exhausted all available administrative procedures, he or she may commence an action in federal court. *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a); *Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F.Supp.3d 424, 429–30 (S.D.N.Y. 2014) ("Any party aggrieved by the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court."). In reviewing a state review officer's final administrative decision, the court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

## B. Standard of Review

A motion for summary judgment in an IDEA action "involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)). Therefore, the Second Circuit has observed that "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn.*

*Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005); *see also J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004) (observing that, in deciding a motion for summary judgment in an IDEA case, "the existence of a disputed issue of material fact will not defeat the motion"). The court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837–38 (2d Cir. 2014). However, the court must "give 'due weight' to the state proceedings, mindful that [the court] lack[s] 'the specialized knowledge and experience necessary to resolve ... questions of educational policy.' " *R.E.*, 694 F.3d at 188 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007)).

Where an IHO and SRO reach conflicting conclusions, the court "defer[s] to the final decision of the state authorities." *A.C.*, 553 F.3d at 171; *see also R.E.*, 694 F.3d at 189 ("[T]he general rule is that 'courts must defer to the reasoned conclusions of the SRO as the final state administrative determination.' ") (quoting *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012)). Therefore, "[c]ourts must defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Dzugas–Smith v. Southold Union Free Sch. Dist.*, No. 08-CV-1319, 2012 WL 1655540, at *25 (E.D.N.Y. May 9, 2012) (internal quotation omitted). However, the Second Circuit has observed that the court's review of the record is not a "rubber stamp[ing]" exercise, *see Walczak*, 142 F.3d at 129, and the amount of "deference owed to an SRO's decision depends on the quality of that opinion." *R.E.*, 694 F.3d at 189. Specifically, "a court must defer to the SRO's decision on matters

requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *Id.* The Second Circuit has held that "[t]he standard of review requires more a critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). Furthermore, the court should give more deference to "the SRO's views of educational policy" and less deference to the "SRO's factual findings or to its reasoning in general." *B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F.Supp.2d 670, 675 (S.D.N.Y. 2012). Likewise, the court need not afford due weight "with respect to ... issue[s] of law ... because state hearing officers are not more experienced or expert than courts in interpreting federal statutes or the federal constitution, and, therefore, deference is not warranted." *Lillbask*, 397 F.3d at 82 (internal quotations omitted). The party seeking reversal of an SRO's decision bears the burden of demonstrating that the decision is not entitled to deference. *See M.H.*, 685 F.3d at 224–25.

## III. DISCUSSION

In moving for summary judgment, Plaintiffs argue that, "[b]ased upon the controlling statutes, an independent review of the evidentiary record, and the application of the Second Circuit's controlling review standards, this Court should reverse the SRO's June 17, 2015 Decision and reinstate the IHO's well-reasoned, thorough and amply supported March 23, 2015 Decision." Pls.' Mem. at 2. In opposition, Defendant argues that the Complaint should be dismissed in its entirety because the SRO Decision "was proper in all respects." *See* Ferrugiari Aff. ¶ 3. Applying the standards outlined above, and for the reasons

set forth herein, Plaintiffs' motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## A. Preliminary Issues

As an initial matter, the parties disagree as to whether: (i) the IDEA's two (2)–year statute of limitations precluded the IHO from considering R.C.L.'s May 2012 IEP; and (ii) the IHO exceeded his jurisdiction by considering whether the denial of ESY services during the summer of 2013 amounted to a denial of a FAPE for R.C.L. Def.'s Mem. at 4–5; Pls.' Mem. at 20–21.

### 1. Statute of Limitations

■■■ Pursuant to the IDEA, a parent challenging a student's IEP must file a due process complaint "within 2 years of the date the parent … knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C); *see also Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 114 n.8 (2d Cir. 2008) (observing that the Second Circuit considers a claim under the IDEA to accrue "when the plaintiff knows or has reason to know of the injury that is the basis of the action"). A parent lacks the requisite knowledge of the alleged action forming the basis of the complaint where he or she was prevented from requesting a hearing due to: "(i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D). As the statute of limitations presents a question of law, the court "may make that determination without deferring to the administrative decisionmaker's conclusions." *Y.A. v. New York City*

*Dep't of Educ.*, No. 15 Civ. 5790, 2016 WL 5811843, at *8 (S.D.N.Y. Sept. 21, 2016).

■■■ In determining that the District failed to provide a FAPE for R.C.L. during the 2012–13 school year, the IHO relied upon, *inter alia*, R.C.L.'s May 2012 IEP, which the CSE developed at its May 24, 2012 meeting. *See* IHO Dec. 31–33. In reversing that portion of the IHO Decision, the SRO observed that, because "the parents attended the May 2012 CSE meeting and understood the recommendations for the student … the parents had until May 24, 2014 to file a due process complaint notice with respect to the May 2012 IEP." SRO Dec. at 12. Therefore, the SRO held that Plaintiffs' DPC "was untimely with respect to claims directed to the May 2012 CSE or resulting IEP." *Id.* Plaintiffs do not dispute that they filed their DPC on June 24, 2014, and that "any claims as to R.C.L.'s 2011–2012 school year are outside of the Statute of Limitations and properly dismissed by the IHO." Pls.' Mem. at 20; *see also* Pls.' 56.1 Stmt. ¶ 159. They argue, however, that "[p]recluding consideration of the May 24, 2012 IEP—an IEP that the District was charged with implementing for R.C.L. each day between September 4, 2012 and November 30, 2012—would unduly prejudice R.C.L." Pls.' Mem. at 20.

Plaintiffs' argument misses the mark, as the SRO did not conclude that the IDEA's statute of limitations barred *all* claims related to the 2012–13 school year. To the contrary, the SRO held that Plaintiffs' June 24, 2012 DPC "placed the entirety of the 2012–13 school year at issue, including claims relating to the implementation of the student's IEPs and the procedural and substantive adequacy of the November 2012 CSE and resulting IEP." SRO Dec. at 12. However, the SRO held that, "any claims regarding the lack of a 12–month school year," including the provision of ESY services for the summer of 2012,

were barred by the statute of limitations as they "would be challenges against the design of the May 2012 IEP that was created just prior to summer 2012." *Id.* at 13. As Plaintiffs attended the May 24, 2012 CSE meeting and were aware that the May 2012 IEP did not provide for ESY services for the summer of 2012, claims regarding ESY services for the summer of 2012 are barred by the IDEA's two (2)–year statute of limitations.[8] *See R.B. ex rel. A.B. v. Dep't of Educ. of City of New York*, No. 10 Civ. 6684, 2011 WL 4375694, at *4 (S.D.N.Y. Sept. 16, 2011) (holding that the plaintiff knew of his injury when he spent money on alternate educational plans). Therefore, the Court considers Plaintiffs' claims to the extent that they accrued after June 24, 2012.

### 2. Jurisdiction and Waiver

▪ Pursuant to the IDEA, a party requesting a due process hearing "shall not be allowed to raise issues at the hearing . . . that were not raised in the notice . . . unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). Therefore, courts in the Second Circuit have "held that issues not raised in the due process complaint are not reviewable in federal court." *H.W. v. New York State Educ. Dep't*, No. 13-CV-3873, 2015 WL 1509509, at *14 (E.D.N.Y. Mar. 31, 2015). However, the IDEA "does not require that alleged deficiencies be detailed in any formulaic manner," and the Second Circuit has held that "the waiver rule is not to be mechanically applied." *C.F.*, 746 F.3d at 78 (citing 20 U.S.C. § 1415(b)(7)(A)(ii)). Rather, the "key to the due process procedures is fair notice and preventing parents from 'sandbagging the school district' by raising

claims after the expiration of the resolution period." *Id.* (quoting *R.E.*, 694 F.3d at 187 n.4); *see also J.W. v. New York City Dep't of Educ.*, 95 F.Supp.3d 592, 603 (S.D.N.Y. 2015) (holding that the plaintiffs did not waive claims where the due process complaint "gave the Department adequate notice that the type of program recommended by the Department—including the methodology of that program—was at issue").

▪ In concluding that the District failed to provide a FAPE for R.C.L., the IHO held that R.C.L. "was entitled to ESY services" during the summers of 2012, 2013, and 2014 because, *inter alia*, R.C.L. "made very little, if any, progress" in reading during the corresponding school years. *See* IHO Dec. at 33–37. As the District did not provide for such ESY services, the IHO held that Defendant failed to provide a FAPE for R.C.L. during the 2012–13, 2013–14, and 2014–15 school years. *Id.* Defendant argues that the IHO exceeded his jurisdiction in holding that the District failed to provide a FAPE for R.C.L. during those school years because, *inter alia*, "[a]lthough plaintiffs sought ESY services at the June 2013 CSE, they never alleged a denial of FAPE in the DPC when such was not recommended." Def.'s Mem. at 4. However, in their DPC, Plaintiffs alleged that the District failed to provide a FAPE for R.C.L. because the District "denied [R.C.L.] Extended School Year ("ESY") services to prevent [R.C.L.'s] academic, social, and emotional regression," and that "[d]ue to [R.C.L.'s] regression especially in the area of reading it [was] imperative that ESY services be afforded to [R.C.L.]."

---

8. Although Defendants argue that "the IHO's findings regarding [the] May 2012 IEP's design . . . [were] improper" as they were outside of the two (2)–year statute of limitations, *see* Def.'s Mem. at 5, they do not dispute the SRO's consideration of "the November 2012 IEP and [R.C.L.'s] 2012–13 school year." SRO Dec. at 13. Therefore, the Court considers whether the District provided a FAPE for R.C.L. during the regular 2012–13 school year.

Pls.' DPC ¶ 24. Therefore, Plaintiffs' DPC provided Defendant with "adequate notice" of the "type of program recommended" by the District—namely, ESY services—that was at issue. *See J.W.,* 95 F.Supp.3d at 603. Furthermore, contrary to Defendant's argument "that the IHO exceeded his jurisdiction" by considering whether the District's failure to provide ESY services amounted to a denial of a FAPE, *see* Def.'s Mem. at 4, the SRO did not actually consider the issue of waiver with respect to ESY services. Rather, with respect to ESY services, the SRO observed that IHO "noted the correct legal standard," but ultimately held that "the hearing record [did] not include evidence that [R.C.L.] demonstrated substantial regression" as required to be eligible for ESY services under the IDEA. SRO Dec. at 35–36. Therefore, Defendant's argument that "the SRO properly found that the IHO exceeded his jurisdiction" lacks merit. *See* Def.'s Mem. at 4.

**B. IDEA Claims**

▆▆▆ Turning to the adequacy of R.C.L.'s IEPs and whether Defendant provided a FAPE for R.C.L. during the 2012–13, 2013–14, and 2014–15 school years, where a plaintiff seeks reimbursement for educational expenditures under the IDEA, the three (3)–pronged *Burlington/Carter* test guides the court's analysis. *Scott,* 6 F.Supp.3d at 436; *see also Florence Cty. Sch. Dist. Four v. Carter,* 510 U.S. 7, 14–15, 114 S.Ct. 361, 365–66, 126 L.Ed.2d 284 (1993); *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 369–70, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985). In applying the *Burlington/Carter* test, the court "looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F.,* 746 F.3d at 76. Al-though the school district bears the burden under the first prong of the *Burlington/Carter* test, the parents bear the burden in the second and third stages of the analysis. *N.S. v. New York City Dep't of Educ.,* No. 13 Civ. 7819, 2014 WL 2722967, at \*13 (S.D.N.Y. June 16, 2014).

▆▆▆ Under the first prong of the *Burlington/Carter* test, the educational authority bears the burden of proving that its IEP and recommended placement were adequate and appropriate. *C.F.,* 746 F.3d at 76. In determining whether an IEP is adequate and appropriate under the first prong of the *Burlington/Carter* test, courts follow a two (2)–part analysis. *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.,* 752 F.3d 145, 160 (2d Cir. 2014). First, the court examines "whether the state has complied with the procedures set forth in the IDEA." *R.E.,* 694 F.3d at 190. Next, the court examines the substantive adequacy of the student's IEP, and whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Under the second prong of the *Burlington/Carter* test, "[t]he parents bear the burden of establishing that the placement they selected was an appropriate one." *P.K. ex rel. S.K. v. New York City Dep't of Educ.,* 819 F.Supp.2d 90, 115 (E.D.N.Y. 2011). Under the third prong of the *Burlington/Carter* test, "the Court must determine whether equitable considerations support Plaintiffs' claim for reimbursement." *P.L. v. New York Dep't of Educ.,* 56 F.Supp.3d 147, 167 (E.D.N.Y. 2014). In moving for summary judgment, Plaintiffs argue that the IHO correctly determined that they satisfied all three (3) prongs of the *Burlington/Carter* test, and that they are therefore entitled to reim-

bursement under the IDEA. Pls.' Mem. at 14–25.

### 1. Procedural Adequacy

▮ In assessing the adequacy of a student's IEP under the first prong of the *Burlington/Carter* test, "[t]he Court first examines whether the District complied with procedures set forth in the IDEA." *H.W.*, 2015 WL 1509509, at *16. However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim .v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Rather, procedural inadequacies in developing an IEP only violate the IDEA if they "impeded the child's right to a free appropriate public education, significantly impeded the parents' opportunity to participate in the decision-making process, or caused a deprivation of educational benefits." *C.F.*, 746 F.3d at 78–79 (internal quotation marks omitted); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii); *R.E.*, 694 F.3d at 190 ("Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."). Plaintiffs argue that R.C.L.'s IEPs were procedurally inadequate because the District denied R.C.L.'s parents the opportunity to fully and meaningfully participate in the CSE process. *See* Pls.' Mem. at 21–23.

▮ The IDEA requires that school districts provide the parents of a disabled child the opportunity to meaningfully participate in the CSE process. *See* 20 U.S.C. § 1415(b)(1); *see also J.E. v. New York City Dep't of Educ.*, 229 F.Supp.3d 223, 234 (S.D.N.Y. 2017) ("[P]redetermination of a child's IEP without meaningful parental input constitutes a procedural violation of Section 1415, which 'can rise to the level of a substantive harm, and therefore deprive a child of a [FAPE] . . . .'") (quoting *J.G. ex rel. N.G. v. Kiryas Joel Union*

*Free Sch. Dist.*, 777 F.Supp.2d 606, 648 (S.D.N.Y. 2011)). A parent's right to participate in the CSE process "is not merely the right to speak . . . ." *S.Y. v. New York City Dep't of Educ.*, 210 F.Supp.3d 556, 575 (S.D.N.Y. 2016). Rather, "[p]arental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation." *Dzugas–Smith*, 2012 WL 1655540, at *27. Although a CSE "need not adopt a parent's recommendation for any particular aspect of an IEP," *see J.E.*, 229 F.Supp.3d at 234, the CSE may not "deprive the [p]arent of meaningful participation by refusing to consider . . . the [p]arent's concerns." *E.H. v. New York City Dep't of Educ.*, 164 F.Supp.3d 539, 551 (S.D.N.Y. 2016). Therefore, "as long as the parents are listened to, this burden is met even if the [school district] ultimately decides not to follow the parents' suggestions." *E.F. v. New York City Dep't of Educ.*, No. 12-CV-2217, 2013 WL 4495676, at *17 (E.D.N.Y. Aug. 19, 2013).

▮ The IHO held that the District denied Plaintiffs the opportunity to meaningfully participate in the CSE process beginning in April 2014. IHO Dec. at 36–37. According to the IHO, "although the CSE allowed [F.L.] to state his concerns during the CSE meetings, the CSE team consistently disregarded [his] concerns." *Id.* at 36. The IHO further observed that, despite evidence supporting the validity of F.L.'s concerns, including Dr. Oratio's March 4, 2014 neuropsychological report, "the CSE continued to ignore [F.L.'s] concerns and actually claimed that [F.L.] was impeding [R.C.L.'s] progress because he wasn't 'buying in' to the District's program." *Id.* Therefore, the IHO held F.L. "was denied meaningful participation in the CSE process, which resulted in the deprivation of an educational benefit to [R.C.L.]." *Id.* at 37. In reversing the IHO

Decision, the SRO observed, *inter alia*, that "the CSE chairperson maintained a rigid agenda with respect to the order in which information was presented," and that he "at times appeared to talk in a manner that may have seemed curt." SRO Dec. at 39. However, the SRO further observed that CSE members "came to the meetings with an open mind, the district staff agreed to some of the parents [*sic*] requests, and . . . the parents and their counsel were afforded the opportunity to raise concerns, ask questions, rebut CSE recommendations, and provide input from private evaluators." *Id.* Therefore, the SRO held that, although "the relationship between the parties became at times acrimonious and in conflict with the spirit of cooperation contemplated by the IDEA, this does not support a finding that the district impeded the parent's participation." *Id.*

Based on the record evidence, including, *inter alia*, transcripts of the April 2, 2014, June 5, 2014, and June 24, 2014 CSE meetings, the SRO correctly held that the District afforded Plaintiffs the opportunity to meaningfully participate in the CSE process. As an initial matter, it is undisputed that F.L. and his attorney attended each CSE meeting and were given the opportunity speak, ask questions, raise concerns, and offer suggestions. *See* Def.'s 56.1 Stmt. ¶¶ 14–17. Furthermore, Plaintiffs' private neuropsychologist, Dr. Oratio, participated in the April 2, 2014 CSE meeting, both discussing her March 4, 2014 neuropsychological evaluation report and offering recommendations regarding appropriate educational programming for R.C.L. *See* Admin R. Ex. 42 at 5–13. Although the CSE did not ultimately adopt each of F.L.'s and Dr. Oratio's suggestions and recommendations, the evidence demonstrates that the CSE actively sought Plaintiffs' participation at the CSE meetings, thoughtfully considered their sugges-

tions, and, where applicable, clearly explained its reasons for declining to adopt Plaintiffs' suggestions and recommendations. For example, while discussing R.C.L.'s reading progress and goals at the April 2, 2014 CSE meeting, the CSE Chairman, Dr. Kenneth Davidow, asked F.L., "the bottom line is what do you want?" *Id.* at 78:10–11. When F.L. stated that he wanted R.C.L. to attend an out-of-district "Fusion" program during the morning, return to Great Neck North for three (3) classes, and then attend out-of-district LMB courses in the afternoon, the District researched and considered F.L.'s suggestion. *See id.* Although the District did not ultimately adopt F.L.'s recommendation, individuals at the CSE meeting noted that it was unclear whether the Fusion program offered the opportunity to earn a Regent's diploma and whether its instructors were New York state-certified special education teachers. *Id.* at 87:5–88:11. Likewise, Great Neck North's principal, Bernard Kaplan, expressed his concern with F.L.'s proposal, stating that a situation in which R.C.L. went "to three schools in one day is . . . going to exacerbate and hurt him more than it's going to help him." *Id.* at 97:19–98:14.

With respect to Plaintiffs' participation at the June 24, 2014 CSE meeting, at the outset of the meeting, Davidow asked whether F.L. had any questions or concerns regarding R.C.L.'s overall speech and language goals for the 2014–15 school year. Admin R. Ex. 43 at 7:15–17. Although F.L. stated that he was "not okay with the goals" identified in R.C.L.'s June 2014 IEP, he failed to provide meaningful input, stating that he was "not going to lengthen [the] meeting" and that he was "not going to agree on anything unless it mirror[ed] what [was] in the due process complaint" he had presented to the District that day. *Id.* at 7:15–8:5. Indeed,

Plaintiffs do not dispute that F.L. "did not add further to the conversation at that particular IEP meeting." Pls.' 56.1 Stmt. ¶ 81. Nevertheless, while discussing R.C.L.'s goals in the areas of study skills, writing, math, and social and emotional skills, F.L. asked several questions, each of which were answered by members of the CSE. See, e.g., Admin R. Ex. 43 at 13:10–18, 19:17–24, 21:4–11. Following the discussion of R.C.L.'s goals for the 2014–15 school year, when asked whether he had any additional comments or questions, F.L. simply responded "No." Id. at 23:15–18. At the end of the June 24, 2014 CSE meeting, Davidow stated that the CSE had "completed the IEP unless the family has any other questions or concerns." Id. at 42:18–20. Although F.L. stated that he did not agree with R.C.L.'s 2014–15 IEP, he did not offer any further comments or suggestions, and instead stated that R.C.L. would attend LMB courses for eight (8) or nine (9) weeks beginning the following week. Id. at 43:1–10. The foregoing demonstrates that, although the District did not ultimately implement Plaintiffs' suggestions, the District afforded Plaintiffs the opportunity to meaningfully participate in the CSE process. See K.F. v. New York City Dep't of Educ., No. 15 Civ. 1126, 2016 WL 3981370, at *8 (S.D.N.Y. Mar. 31, 2016) (holding that the IDEA does not "require the Committee to ensure that [the parent] spoke on every point or to defer to her view regarding the proper class size and peer group for" the student); R.K. ex rel. R.K. v. New York City Dep't of Educ., No. 09-CV-4478, 2011 WL 1131492, at *14 (E.D.N.Y. Jan. 21, 2011) (holding that a school district did not violate the IDEA where plaintiffs' "real objection [was] not that the parents lacked the opportunity to participate in the IEP meeting, but rather that the IEP ultimately did not incorporate their concerns").

Relying upon T.K. v. New York City Dep't of Educ., 810 F.3d 869 (2d Cir. 2016), Plaintiffs argue that "the District covered its ears and eyes, protesting (solely by way of subjective evidence) that R.C.L. was progressing and thus refused to meaningfully consider F.L.'s concerns with R.C.L.'s program." Pls.' Mem. at 23. In T.K., the defendant school district repeatedly refused to discuss the plaintiffs' complaints that a disabled student "was constantly teased, excluded from groups, and subjected to a hostile environment" at school. 810 F.3d at 877. In holding that the school district failed to adhere to the IDEA's procedural requirements, the Second Circuit wrote that the defendant's "persistent refusal to discuss [the student's] bullying at important junctures in the development of her IEP 'significantly impeded' Plaintiffs' right to participate in the development of [her] IEP." Id. According to Plaintiffs, "[t]he instant case involves the very same fatal flaw" as that in T.K.—namely, that the District refused to consider or discuss Plaintiffs' explicit concerns. Pls.' Mem. at 22–23. However, unlike T.K., as discussed above, the evidence establishes that Defendant discussed and considered each of Plaintiffs' concerns, and, in fact, actively sought F.L.'s participation at the CSE meetings. Furthermore, and contrary to Plaintiffs' claim that Defendant "covered its ears and eyes" to objective evidence, as discussed above, the CSE considered Dr. Oratio's March 4, 2014 neuropsychological examination at the April 2, 2014 CSE meeting. See Admin R. Ex. 42 at 5–13. Although the CSE ultimately declined to rely upon Dr. Oratio's conclusions, observing, inter alia, that Dr. Oratio based her opinions on "only one piece of the picture," see id. at 13:18–25, it is well established that a "professional disagreement is not an IDEA violation." See P.K. v. Bedford Cent. Sch. Dist., 569 F.Supp.2d 371, 383 (S.D.N.Y. 2008) ("The

fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEPs, or that the outcomes of the CSE meetings were 'pre-determined.' "). Therefore, Plaintiffs' argument that Defendant "consistently disregarded and ignored the[ir] ... concerns," see Pls.' Mem. at 5, lacks merit.

Based upon the foregoing, the SRO correctly held that the District complied with the IDEA's procedural requirements and allowed Plaintiffs to meaningfully participate in the CSE process.

### 2. Substantive Adequacy

In addition to adhering to the IDEA's procedural requirements, a school district must develop a substantively adequate IEP. *See D.A.B. v. New York City Dep't of Educ.*, 973 F.Supp.2d 344, 361 (S.D.N.Y. 2013). In analyzing an IEP's substantive adequacy, courts review "the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Gagliardo*, 489 F.3d at 113 (internal quotation omitted). An IEP is substantively adequate if it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, ——— U.S. ———, 137 S.Ct. 988, 999, 197 L.Ed.2d 335 (2017). Although the IDEA "does not ... require states to develop IEPs that maximize the potential of handicapped children," *see S.W. v. New York Dep't of Educ.*, 92 F.Supp.3d 143, 159 (S.D.N.Y. 2015), the IEP "must aim to enable the child to make progress." *Endrew F.*, 137 S.Ct. at 999; *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (holding that a school district is not "required to furnish every special service necessary to maximize each

handicapped child's potential") (internal quotation omitted). Therefore, a school district satisfies its obligations arising under the IDEA "if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *M.P.G. ex rel. J.P. v. New York City Dep't of Educ.*, No. 08 Civ. 8051, 2010 WL 3398256, at *10 (S.D.N.Y. Aug. 27, 2010) (citing *Cerra*, 427 F.3d at 195). A substantively inadequate IEP "automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190. Furthermore, as "administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195. Plaintiffs argue that R.C.L.'s IEPs were substantively inadequate because: (i) they were not individualized to R.C.L.'s particular needs; and (ii) they failed to provide for ESY services for R.C.L. *See* Pls.' Mem. at 9; *see also* Reply Memorandum of Law in Further Support of Plaintiffs' Motion for a Modified *De Novo* Review ("Pls.' Reply Mem."), DE [31], at 6–11.

### i. *Individualization*

#### (a) 2012–2013 IEPs

With respect to the 2012–13 IEPs, the IHO held that the District failed to provide R.C.L. a FAPE because: (i) the CSE "continued to recommend the same program that R.C.L. had the year before" despite R.C.L.'s scores on "cognitive and academic testing, and R.C.L.'s very poor results on the State assessments"; and (ii) the CSE failed to recommend a specific program to meet R.C.L.'s reading and math needs. IHO Dec. at 31–33. In reversing the IHO Decision, the SRO observed: (i) R.C.L. had made progress under the prior IEPs; and (ii) the CSE was not

required to specify a specific methodology or curriculum for R.C.L.'s reading and math programs. SRO Dec. at 13–19. In moving for summary judgment, Plaintiffs argue that R.C.L.'s IEPs were substantively inadequate because they "largely regurgitate[d] many of the same goals year after year," and R.C.L. "*regressed* (or remained stagnant) across seven domains between 2011 and 2013." Pls.' Mem. at 14 (emphasis in original). According to Plaintiffs, the District denied R.C.L. a FAPE for the 2012–13 IEP by "continu[ing] to attend placement in a 12:1+1 program" because it had "already resulted in R.C.L.'s educational stagnation and even regression, as evidenced by the objective evidence." *Id.* at 15. Even accepting as true Plaintiffs' characterization that R.C.L.'s May 2012 and November 2012 IEPs were substantially similar to his 2011–12 IEP,[9] a school district does not deny a student a FAPE by developing an IEP that is the same as a prior year's IEP so long as it "enable[s] [the student] to receive meaningful educational benefits and make progress." *H.C. ex rel. M.C. v. Katonah–Lewisboro Union Free Sch. Dist.*, 528 Fed.Appx. 64, 67 (2d Cir. 2013). Although F.L. "indicated that he ha[d] not seen any progress" during the 2011–12 school year, at the May 24, 2012 CSE meeting, several teachers stated that R.C.L. had, in fact, made progress. *See* Admin. R. Ex. 28. For example: (i) Verderose stated that she was "very pleased with [R.C.L.'s] progress" in his special education courses; (ii) R.C.L.'s general education reading teacher stated that R.C.L. had "made gradual progress" in decoding and spelling; (iii) an occupational therapy report stated that R.C.L. "ha[d] made progress with writing his first and last

name in cursive"; and (iv) R.C.L.'s speech therapist stated that she had "seen significant improvements in [R.C.L.'s] pragmatic language." *Id.* Assessing the 2011–12 school year as a whole, Davidow "indicated that [R.C.L.] ha[d], in fact, made progress [that] year." *Id.* As R.C.L. made progress under the educational program provided for in his 2011–12 IEP, the District did not deny R.C.L. a FAPE by developing a substantially similar educational program for the 2012–13 school year. *See J.C.S. v. Blind Brook–Rye Union Free Sch. Dist.*, No. 12 Civ. 2896, 2013 WL 3975942, at *11 (S.D.N.Y. Aug. 5, 2013) (holding that, "in light of [the student's] academic needs remaining substantially the same, the CSE's decision to draw from the prior IEP did not result in the denial of a FAPE").

Furthermore, although Plaintiffs argue that "the SRO erroneously elected to ignore the implications of the objective, standardized tests in favor of crediting subjective testimony," they fail to identify any objective evidence of regression that was available to the CSE at the time R.C.L.'s May 2012 and November 2012 IEPs were developed. *See* Pls.' Mem. at 16. To the contrary, in arguing that R.C.L. "had been languishing and regressing for *years* in the defendant's programs," Plaintiffs rely upon the comparison of "the district's own standardized educational testing in September 2011 and Dr. Oratio's standardized educational testing in December 2013." *Id.* at 14 (emphasis in original). However, Dr. Oratio's standardized educational testing was conducted *after* the 2012–13 school year on December 17, 2013, and was therefore unavailable when the CSE developed R.C.L.'s May 2012 and November 2012 IEPs. Therefore, Plaintiffs' argument that

---

9. The SRO observed that "the hearing record does not include a copy of the student's IEP for the 2011–12 school year making comparison of the educational programs less precise."

SRO Dec. at 13. Therefore, the Court accepts Plaintiffs argument as true for purposes of the instant Opinion.

R.C.L.'s placement in a 12:1:1 classroom "had already resulted in R.C.L.'s educational stagnation and even regression, as evidenced by the objective evidence," lacks merit. *Id.* at 15 (emphasis in original); *see also L.B. v. New York City Dep't of Educ.,* No. 15 Civ. 3176, 2016 WL 5404654, at *11 (S.D.N.Y. Sept. 27, 2016) (holding that the school district provided a FAPE where the CSE "relied on the most accurate and up-to-date information at its disposal to ascertain [the student's] educational strengths, challenges, and needs"). To that end, Plaintiffs' claim that R.C.L.'s progress reports are "arguably one of the most *important* pieces of evidence" is similarly meritless. Pls.' Mem. at 19. Although Plaintiffs argue that the progress reports offer "a closer look into who R.C.L. is as a writer, a speller and a student," *see id.* (emphasis in original), they are dated January 18, 2011, January 22, 2013, and June 22, 2013. *See* Ex. P–Q. As the January 22, 2013 and June 22, 2013 progress reports were created *after* the CSE developed the May 2012 and November 2012 IEPs, they do not provide objective evidence that R.C.L. had regressed under the educational programming provided for during the 2011–12 school year. Accordingly, Plaintiffs' argument that the SRO improperly ignored objective evidence in favor of subjective evidence lacks merit.

▉ Plaintiffs further argue that the May 2012 and November 2012 IEPs were substantively inadequate because they did not include specific programs for reading and mathematics. Pls.' Mem. at 14–19. Relying upon *Draper v. Atlanta Indep. Sch. Sys.,* 480 F.Supp.2d 1331 (N.D. Ga. 2007), Plaintiffs argue that "[a] school district's failure to adequately address a student's needs in reading is alone sufficient to deprive that student of a FAPE and violate the IDEA." *Id.* at 15 (emphasis in original). However, an IEP need not "mention evaluative methods or a particular teaching methodology" to be substantively adequate. *K.L. ex rel. M.L. v. New York City Dep't of Educ.,* 530 Fed.Appx. 81, 86 (2d Cir. 2013). Although the 2012–13 IEPs do not enumerate a specific methodology or curriculum for a reading or math program, Verderose testified at the IHO Hearing that the District does not "subscribe to any one reading program," and that R.C.L.'s program was "pretty individualized for him." *See* IHO Hearing Transcript ("Tr.") at 791:8–12. To that end, R.C.L.'s May 2012 and November 2012 IEPs provide for forty (40) minutes of resource room on a daily basis, establish goals in both reading and mathematics, and state that R.C.L. will work on his IEP goals in resource room.[10] *See* Admin. R. Ex. 28. Indeed, the SRO observed that the November 2012 IEP "described [R.C.L.'s] needs, including those related to reading and mathematics, and developed annual goals to target these needs." SRO Dec. at 20. Furthermore, as discussed above, at the November 30, 2012 CSE meeting, Verderose stated that R.C.L. had made progress during the

---

10. Plaintiffs argue that the "building level services" that the District provided for R.C.L., including a Wilson reading program and other forms of reading remediation, is retrospective evidence that cannot be used in assessing the adequacy of an IEP. Pls.' Mem. at 7–8; *see also R.E.,* 694 F.3d at 186–87 (holding that the court must evaluate the IEP "prospectively as of the time of its drafting," and "both parties are limited to discussing the placement and services specified in the writ-

ten plan and therefore known to the parties at the time of the placement decision"). However, the SRO stated that he did not rely on the building level services, and instead found that the District provided a FAPE based upon the provision of a 12:1:1 classroom and resource room without reliance on Defendant's provision of building level services. *See* SRO Dec. at 19–20. Therefore, the Court need not address the issue of retrospective evidence.

2011–2012 school year. Admin. R. Ex. 28. Therefore, although the May 2012 and November 2012 IEPs do not specifically enumerate a reading or math curriculum, they were substantively adequate under the IDEA, as they were developed in a manner that was likely to promote progress and not regression. *K.L*, 530 Fed.Appx. at 86 (holding that an IEP was not substantively inadequate simply "because it did not mention evaluative methods or a particular teaching methodology"); *see also E.W.K. ex rel. B.K. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 884 F.Supp.2d 39, 51 (S.D.N.Y. 2012) (holding that an IEP was adequate even where "it did not include particular reading programs or goals provided in prior years").

Based upon the foregoing, the SRO correctly held that the District provided a FAPE for R.C.L. during the 2012–13 school year.

#### (b) 2013–2014 IEPs

■ With respect to the 2013–14 IEP, the IHO held that the District failed to provide a FAPE for R.C.L. because: (i) the CSE's recommendation that R.C.L. be placed in a 15:1 classroom was insufficient to meet R.C.L.'s educational needs; and (ii) the reading program provided for the prior year had been eliminated. IHO Dec. at 34–35. In reversing the IHO Decision, the SRO observed, *inter alia*, that: (i) the CSE "progressively added additional supports more targeted to [R.C.L.'s] particular needs while balancing the benefit [R.C.L.] would receive by exposure to the content curriculum of the 15:1 special class, rather than the life and functional based skills addressed in the district's 12:1 + 1 special class"; and (ii) the June 2013 IEP "described the student's needs in all areas, including reading and prescribed annual goals and related services to target such needs." SRO Dec. at 31–35. With respect to R.C.L.'s placement in a 15:1

classroom, Plaintiffs argue that, "[i]f R.C.L. was struggling in a smaller class with more teaching support, common sense tells us all that he would not be expected to do well with a larger class size and less teaching support." Pls.' Reply Mem. at 10.

■ As an initial matter, it is well established that, "[t]hat the size of the class in which [a student] was offered a placement was larger than his parents desired does not mean that the placement was not reasonably calculated to provide educational benefits." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 869 F.Supp.2d 320, 335 (E.D.N.Y. 2012). Although Plaintiffs requested that R.C.L. be placed in a smaller classroom for the 2013–14 school year, "[t]he IDEA 'expresses a strong preference' for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 143 (2d Cir. 2013) (quoting *Walczak*, 142 F.3d at 122)). At the June 17, 2013 CSE meeting, the CSE considered reports and evaluations of R.C.L.'s progress in his classes and ultimately concluded that placement in the Foundations program in a 15:1 classroom was appropriate as the least restrictive environment for R.C.L. *See* Admin. R. Ex. 21. With respect to R.C.L.'s progress, his general education teacher stated that R.C.L. had made progress in tracking words while reading aloud, that his decoding for oral reading had improved, and that he made fewer mistakes in reading words. *Id.* Similarly, R.C.L.'s speech and language therapist stated that R.C.L. had made progress in his ability to predict and explain the basis for his opinions and had improved his vocabulary and ability to draw simple conclusions. *Id.* Therefore, contrary to Plaintiffs' argument that the evidence demonstrated that R.C.L. was struggling in the 12:1:1

classroom, his teachers testified that he was making progress, and, as with the 2012–13 IEPs discussed above, Dr. Oratio's evaluation had not taken place at the time the 2013–14 IEPs were developed. Ultimately, as the issue of the appropriate classroom size involves a question of teaching methodology, the Court defers to the SRO's conclusion that R.C.L.'s placement in a 15:1 classroom was appropriate. *See T.L. ex rel. B.L. v. Dep't of Educ. of City of New York*, No. 10-CV-3125, 2012 WL 1107652, at *15 (E.D.N.Y. Mar. 30, 2012) (deferring to the SRO's finding that placement in a larger class was appropriate and "in accordance with the strong policy preference to educate students in the least restrictive environment appropriate to the student's needs and abilities").

With respect to R.C.L.'s reading program for the 2013–14 school year, like R.C.L.'s 2012–13 IEPs, his 2013–14 IEPs provide for forty (40) minutes of resource room on a daily basis, include specific goals in reading and mathematics, and state that "reading would be worked on in Resource Room." IHO Dec. at 35. To that end, the CSE agreed that "a resource room period would be necessary to reinforce assistive technology and foundational skills in reading and math." Admin. R. Ex. 28. Indeed, Verderose testified that in 2013, "the resource room period became a dedicated period to do the reading skills," and that R.C.L. generally worked on his reading program during fourth period. Tr. 775:13–776:11–19. Furthermore, at the June 17, 2013 CSE meeting, Verderose stated that she met with R.C.L. on a daily basis, that he was working hard, and that he was making progress on his goals. *Id.* at 778:18–22. Although R.C.L.'s parents requested that R.C.L. be placed in the LMB reading program, the SRO correctly observed that "there [was] no information in the hearing record about [R.C.L.'s] success in the LMB program years earlier

other than the parents' representations during the June 2013 CSE meeting and the general testimony of the director of LMB." SRO Dec. at 31. Furthermore, the June 2013 IEP stated that "[t]he school will continue to provide reading support through the resource room class, as well as the Foundations program." Admin. R. Ex. 21. As an IEP "must be reasonably calculated to enable the child to receive education benefits," and "need not furnish every special service necessary to maximize each handicapped child's potential," *see K.L.*, 530 Fed.Appx. at 86, the District did not deny R.C.L. a FAPE by declining to place him in the LMB program. Rather, for the reasons set forth with respect to R.C.L.'s 2012–13 IEPs, the reading plan provided for in the 2013–14 IEPs was designed to promote progress and not regression, and was therefore substantively adequate under the IDEA.

Based upon the foregoing, the SRO correctly held that the District provided a FAPE for R.C.L. during the 2013–14 school year.

### (c) 2014–2015 IEP

Finally, with respect to the June 2014 IEP, the IHO held that the District failed to provide a FAPE for R.C.L. because Dr. Oratio's testing results, as well as the District's testing results from 2011, demonstrated that continued placement in a 15:1 class was inappropriate to meet R.C.L.'s individual needs. IHO Dec. at 35–36. In reversing the IHO Decision, the SRO observed that, as with the 2013–14 IEPs, the June 2014 IEP's "recommended special education program and services still aligned with [R.C.L.'s] needs for the 2014–15 school year and the ultimate implementation of the BIP appears to have made a difference in [R.C.L.'s] motivation and success leading up to the June 2014 CSE meetings." SRO Dec. at 44. Although

Dr. Oratio recommended that R.C.L. be placed in a smaller classroom than the 15:1 classroom provided for under the Foundations program, "[t]he mere fact that a separately hired expert has recommended different programming does nothing to change the deference to the district and its trained educators." *E.S. ex rel. B.S. v. Katonah–Lewisboro Sch. Dist.*, 742 F.Supp.2d 417, 436 (S.D.N.Y. 2010) (internal quotation and alteration omitted); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003) (reversing a district court that "impermissibly chose between the views of conflicting experts on a controversial issue of educational policy … in direct contradiction of the opinions of state administrative officers who had heard the same evidence"); *C.H. v. Goshen Cent. Sch. Dist.*, No. 11 Civ. 6933, 2013 WL 1285387, at *14 (S.D.N.Y. Mar. 28, 2013) ("[T]he law does not require an IEP to adopt the particular recommendation of an expert; it only requires that the recommendation be considered in developing the IEP."). In declining to follow Dr. Oratio's recommendation regarding classroom placement, the CSE noted that Dr. Oratio's reliance on standardized testing scores was "only one piece of the picture of what [the CSE] [has] to look at," that Dr. Oratio had not "heard from the teachers in terms of what they're doing curriculum based," and that at the time of Dr. Oratio's evaluation, additional supports had only recently been implemented. Admin. R. Ex. 42 at 13:6–25, 15:19–25. To that end, when asked at the IHO Hearing whether she agreed with Dr. Oratio's opinion that R.C.L. had "plateaued," Verderose testified that, "[a]ccording to what [she] [was] seeing in the classroom, [she] [was] seeing a different picture." Tr. 842:4–10. As the District and its educators are entitled to deference with respect to their educational programming decisions, *see E.S.*, 742 F.Supp.2d at 436, the CSE

was not required to adopt Dr. Oratio's recommendation that R.C.L. be placed in a smaller classroom for the 2014–15 school year. *See also C.H.*, 2013 WL 1285387, at *14. Rather, again relying upon reports and evaluations of R.C.L.'s progress, the CSE recommended that R.C.L. be placed in the Foundations program in a 15:1 classroom. Admin. R. Ex. 21. For the reasons discussed above, the Court again defers to the SRO's determination that R.C.L.'s placement in a 15:1 classroom was appropriate and was likely to promote progress and not regression. Therefore, the SRO correctly held that the District provided a FAPE for R.C.L. during the 2014–15 school year.

*ii. Extended School Year Services*

█ Plaintiffs further argue that R.C.L.'s IEPs were substantively inadequate because they failed to provide for ESY services. *See* Pls.' Mem. at 5–6. The Second Circuit has observed that "[s]ome children with disabilities need educational services not only during the regular school year, but over the summer as well." *T.M.*, 752 F.3d at 152. Therefore, a school district must provide ESY services for eligible students. *See* 8 N.Y.C.R.R. § 200.4(d)(2)(x); *see also* 34 C.F.R. § 300.106(a)(1) (requiring that school districts make ESY services "available as necessary to provide FAPE"); *T.M.*, 752 F.3d at 163 ("If a disabled child needs ESY services in order to prevent substantial regression, that child's ESY placement is an integral part of his or her twelve-month educational program."). A child is eligible for ESY services if a twelve (12)–month educational program is needed "to prevent substantial regression." 8 N.Y.C.R.R. § 200.6(k)(1). State regulations define "substantial regression" as a "students inability to maintain developmental levels due to a loss of skill or knowledge

during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish IEP goals and objectives mastered at the end of the previous school year." *Id.* at § 200.1(aaa). Although not specifically defined, courts consider a period of eight (8) weeks or more to be an "inordinate period of review." *See D.D–S. v. Southold Union Free Sch. Dist.,* No. 09-CV-5026, 2011 WL 3919040, at *16 (E.D.N.Y. Sept. 2, 2011). The party seeking ESY services bears the burden of production. *Id.*

The IHO held that the District failed to provide a FAPE for R.C.L. because R.C.L.'s IEPs did not provide for ESY services despite the fact that R.C.L. "made very little, if any, progress during the 2011–13 [*sic*] school year." IHO Dec. at 33. In reversing the IHO Decision, the SRO held that the IHO "noted the correct legal standard" but failed to "cite to any evidence in the hearing record indicating that the June 2013 CSE had before it evidence of substantial regression." SRO Dec. at 35. According to Plaintiffs, R.C.L. "*regressed* during each summer," and his regression was "supported by *objective, concrete* standardized testing results and evaluations that were never rejected or challenged by the CSE." Pls.' Mem. at 6 (emphasis in original). Plaintiffs fail to cite any evidence that R.C.L. regressed during the summer months as is required to be entitled to ESY services. 8 N.Y.C.R.R. § 200.6(k)(1). Although Plaintiffs argue that Dr. Oratio's neuropsychological evaluation and R.C.L.'s standardized testing results demonstrate regression, there is no evidence that any such regression occurred over the summer months while R.C.L. was out of school. Furthermore, even accepting as true that R.C.L. regressed over the summer, Plaintiffs fail to identify any evidence suggesting that an "inordinate period of review" would be re-quired to reestablish the IEP goals and objectives mastered during the prior school year. *Id.* at § 200.1(aaa). Therefore, Plaintiffs fail to satisfy their burden of production in demonstrating that R.C.L. was entitled to ESY services. *See D.D–S.,* 2011 WL 3919040, at *16 (holding the plaintiff was not entitled to ESY services where she failed to demonstrate that "her academic skills would regress after summer vacation or another extended break to the point that they could not be recouped in twenty-to-forty school days").

Based upon the foregoing, the SRO correctly held that R.C.L.'s IEPs were both procedurally and substantively adequate. As the District provided a FAPE for R.C.L. during the 2012–13, 2013–14, and 2014–15 school years, the Court need not consider the second and third prongs of the *Burlington/Carter* test. Therefore, Plaintiffs' motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## IV. CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for summary judgment is denied and Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment in Defendant's favor and to close this case.

**SO ORDERED.**